## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | | |
|---|---|---|
| BLUE STAR SPORTS HOLDINGS, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | CIVIL ACTION NO. 4:22-cv-00098 |
| v. | § | |
| FEDERAL INSURANCE COMPANY, | § | **Jury Trial Demanded** |
| | § | |
| Defendant. | § | |

## PLAINTIFF'S FIRST AMENDED COMPLAINT

Plaintiff Blue Star Sports Holdings, Inc. ("Plaintiff") files this First Amended Complaint against Defendant Federal Insurance Company ("Federal") and would show as follows:

### I.    NATURE OF THE ACTION

1.    Federal broke its promises and breached the duties it owed to its insured, Plaintiff Blue Star Sports Holding, Inc., under its Forefront Portfolio 3.0 Policy (Policy Number 8250-2086) ("Policy"). Although the Policy provides coverage for losses caused by employee "Theft" (as defined in the Policy), Federal nevertheless denied Plaintiff's claim which exceeded the $3,000,000 policy limit for Plaintiff's losses caused by various acts of Theft committed by two employees (individually, "Employee 1" and "Employee 2"; collectively, the "Employees"). The now former Employees were employed by Plaintiff's wholly-owned subsidiary, which is also an insured under the Policy (Plaintiff, collectively with the referenced subsidiary, shall be referred to as "Blue Star"). Federal has failed to attempt in good faith to effectuate a fair, prompt, and equitable settlement of the claim, even though Federal's liability under the Policy is reasonably clear. By this lawsuit, Plaintiff seeks to hold Federal accountable for its promises and for its unfair and deceptive acts or practices in the business of insurance.

## II.     THE PARTIES

2.      Plaintiff Blue Star Sports Holdings, Inc. is a Delaware corporation with its principal place of business located at 5360 Legacy Drive, #150, Plano, Texas 75024.

3.      Defendant Federal Corporation d/b/a Federal Group of Insurance Companies is a New Jersey domestic profit corporation with its principal place of business located at 202B Hall's Mill Road, Whitehouse Station, New Jersey 08889. Federal is an insurance company doing business in the state of Texas. Federal may be served by serving its registered agent for service, Corporation System, 1999 Bryan Street, Suite. 900, Dallas, Texas 75201-3136.

## III.     JURISDICTION AND VENUE

4.      Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of interests and costs. This Court therefore has jurisdiction over the lawsuit pursuant to 28 U.S.C. §1332(a).

5.      Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district.

## IV.     ALLEGATIONS COMMON TO ALL COUNTS

6.      Plaintiff Blue Star Sports Holdings Inc. is a sports media business offering sports and league management tools, camp and event management solutions, team recruiting management, sports funding and payment solutions, among other services designed to assist with every aspect of sports for youth, college and professional athletes, and parents and volunteers.

7.      Plaintiff and Federal entered into a valid contract whereby Plaintiff purchased the Policy from Federal, which included a Crime Coverage Part ("Crime Cover"). Under the Crime Cover, Federal is obligated to provide coverage to Plaintiff for losses sustained by Plaintiff and its subsidiaries due to "Theft" by an "Employee" as follows:

> [Federal] shall pay the [Plaintiff] for direct loss of **Money** . . . or **Property** sustained by an **Insured** resulting from **Theft** or **Forgery** committed by an **Employee** acting alone or in collusion with others.[1]

Policy, Crime Cover §I.A (bold in original). "Theft," as used above, means "the unlawful taking of **Money**, **Securities** or **Property** to the deprivation of . . . an **Insured** . . . ." *Id*. at § II (bold in original). "Employee" is defined to include, among other things, "a natural person in the regular service of an **Organization** in the ordinary course of such **Organization's** business, whom such **Organization** governs and directs in the performance of such service . . . ." *Id*. at "Employee", § A. "Organization" means "[Plaintiff] and any **Subsidiary**. . . ." General Terms and Conditions § II (bold in original).

8.      While the Policy was in effect, a receiver for one of Blue Star's customers, Customer X, contacted Blue Star asserting a claim for millions of dollars Blue Star allegedly owed Customer X. Blue Star launched an internal investigation, uncovering multiple Thefts committed by Employees 1 and 2, each of whom were employed by Blue Star. Both are natural persons who were subject to the governance of Blue Star and were therefore Employees as defined in the Crime Cover.[2]

9.      Each also had financial management and reporting roles within Blue Star. Employee 2 managed Plaintiff's business relationship with Customer X and Employee 1 oversaw certain aspects of financial reporting and banking with respect to the Customer X relationship.

10.     **Employee 1's Theft of $1,065,964**. As a result of Blue Star's investigation, Blue Star uncovered a Theft perpetrated by Employee 1. Specifically, Employee 1 made or caused to be made six unlawful bank transfers totaling $1,065,964 from an account containing Plaintiff's funds to an entity owned and/or controlled by Employee 1. A tracing analysis demonstrated that

---

[1]    Quoted terms appearing in bold type are defined terms within the Policy.
[2]    During Plaintiff's investigation, as set forth more fully below, Plaintiff discovered that Employee 2 has been involved in multiple lawsuits related to various unlawful schemes that Employee 2 perpetrated against other victims, including fraud lawsuits.

the source of the $1,065,964 in illegal wire transfers originated from payments made to Blue Star by Customer X for services rendered by Blue Star, which Employee 1 subsequently wired to an account owned by a separate entity he controlled. Employee 1's entity has no connection with Plaintiff, nor did it have any lawful right or claim to Plaintiff's funds. Under the terms of the Policy, Employee 1's six unauthorized transfers of Blue Star's money totaling $1,065,964 to Employee 1's separate business were unlawful takings that constitute Thefts. Blue Star submitted proof of these Thefts to Federal, but Federal denied coverage for the Thefts under the Policy and has refused to pay Blue Star's claim in breach of its contractual and other legal duties.

11.     **The Employees' $3,000,000 Joint Theft.** Employee 1 and/or Employee 2 stole an additional $3,000,000 in customer payments to Blue Star sent by Customer X. On July 25, 2019, the Blue Star's CFO asked Employee 1 to confirm the payments made to Blue Star by Customer X in May and June of 2019 for services rendered by Blue Star. Employee 1, copying Employee 2, informed the CFO that Customer X made three payments totaling $3,000,000 as follows: $1,500,000 on May 6, 2019; $1,000,000 on June 4, 2019; and $500,000 on June 17, 2019. His email included the wire transfer descriptions for the payments:

> Sorry been a hectic couple days. Total of 3 ▇▇▇▇ collections during May/June on 5/6, 6/4 & 6/17 in the amounts of $1.5M, $1M & $500K, respectively. Descriptions read "▇▇▇▇▇▇▇:OBI ▇▇▇▇ PAYMENT ONLINE"

12.     The $3,000,000 in funds remain unaccounted for and were never received by Blue Star. When Blue Star confronted Employee 2 about the missing funds, he refused to provide Blue Star with any records or other information as to their whereabouts**.** Blue Star owned the referenced $3,000,000. After Employee 1 acknowledged the receipt and existence of the $3,000,000, the Money disappeared, with Employee 1 and Employee 2 refusing to account for its whereabouts. Employees 1 and 2 exercised control over the $3,000,000 of Blue Star's Money that exceeded their authority and refused Blue Star its rightful use and control of the funds. As such, Employees 1 and 2 committed an unlawful taking of Blue Star's Money for which coverage is owed under the

Policy. Despite this, Federal has denied coverage for the Thefts thereby breaching its contractual and other legal duties owed to Blue Star.

13. **Employee 2's Theft of over $5 million.** Further, on information and belief, Employee 2 engineered yet a separate Theft of over $5,000,000. Specifically, the business relationship with Customer X was designed to generate a minimum profit to Blue Star of $7,200,000. In addition to being a customer, Customer X was a vendor to Blue Star under a separate contract with Blue Star. The delta between the two contracts should have benefitted Blue Star by $7,200,000 or more over their two-year relationship. Customer X has subsequently gone into receivership with the receiver prosecuting a claim for millions of dollars allegedly owed by Blue Star, despite the fact that Blue Star's own records reflect that Customer X owes Blue Star a substantial debt.

14. Blue Star's investigation revealed that Employee 2 manipulated the Customer X relationship for his own profit, stealing what Employee 2 described as a "guaranteed profit" from Blue Star. Specifically, Employee 2 had been making wire transfers from a bank account containing Blue Star's funds to a bank account controlled by Employee 2. Based on a comprehensive tracing analysis, the source of the $5 million in illegal wire transfers to entities owned or controlled by Employee 2 originated from receipts from Customer X for services rendered by Blue Star. Employee 2 has failed and refused to provide certain relevant bank records that might further illuminate the Theft.

15. **The Employees' Robust Efforts to Conceal the Theft**. Employees 1 and 2 sought to conceal their Thefts and other unlawful actions. First, the Employees predominantly used email addresses and bank accounts for the Customer X relationship that were separate from the email addresses and bank accounts provided by Blue Star for use in connection with Blue Star's business.

As a result, the Employees controlled the flow and access to the inner workings of Blue Star's relationship with Customer X.

16.     Second, Blue Star discovered incontrovertible proof that the Employees worked together to falsify and forge certain bank records by *physically altering* the account balances in order to conceal their Theft and evade detection by Blue Star's independent auditors.

17.     Third, when Blue Star investigated the Customer X relationship and accounts, the Employees withheld certain bank records from Blue Star or provided heavily redacted versions of such statements. Ultimately, Employee 2 agreed only to provide Blue Star with limited, un-redacted records on the extraordinary condition that Blue Star refrain from providing them to Blue Star's CFO and in-house counsel, both of whom were likely to uncover the Employees' Theft.

18.     Fourth, on the date Employee 2 was terminated, Employee 2 ordered another employee to permanently delete all data from a separate email domain that Blue Star owned as evidenced by a sworn statement provided by the employee who received the instruction. Notably, Employee 2 gave this instruction shortly after Blue Star began inquiring into the bank transactions with Customer X. The Employees ***exclusively*** used the deleted email domain to communicate with Customer X, and, on information and belief, Employees 1 and 2 communicated with each other using the deleted email domain. Thus, Employee 2 gave the instruction in furtherance of his attempts to cover up the Thefts.

19.     Fifth, Blue Star discovered that Employee 2 has been involved in multiple lawsuits related to various unlawful schemes that Employee 2 perpetrated against other victims. In fact, immediately after Customer X went into receivership, Employee 2 was alleged to have cooked up a new fraudulent scheme to steal $1,000,000 from another investor based on a fictitious "non-existent trading platform" to invest in "humanitarian" projects in Africa.

20.     Sixth, upon information and belief, and as a result of the fictitious humanitarian scheme, Employee 2 is under investigation by the Federal Bureau of Investigation and the Department of Justice.

21.     **Federal's Unreasonable Refusal to Pay the Claim**. After discovering the Thefts perpetrated by the Employees, and in consideration of the foregoing evidence in support of the conclusion that Blue Star suffered one or more covered Thefts under the Policy, on June 12, 2020, Blue Star submitted a claim under the Policy ("Claim") detailing its losses in the amount of *at least* $6,000,000 and seeking to recover the Policy limit of $3,000,000. In conjunction with its Claim, Blue Star provided Federal with the relevant documentation including bank records, contracts, court filings, and evidence of the physical alteration and forgery of bank records.

22.     On July 14, 2020, Federal made its first request for additional information and documentation in support of Blue Star's claim. On July 27, 2020, Blue Star promptly furnished the requested information and documents.

23.     On September 23, 2020, Federal conveyed its second request for additional information and documentation. On October 13, 2020, Blue Star promptly furnished the requested information and documents.

24.     On November 16, 2020, Federal made its third request for information. On November 30, 2020, Blue Star promptly furnished the requested information.

25.     On December 18, 2020, Federal sent its fourth request for information and documentation. On January 8, 2021, Blue Star promptly furnished the requested information and documents.

26.     On February 24, 2021, Blue Star's counsel and Federal had a Zoom meeting to discuss the details of the claim. In that meeting, Federal conveyed its fifth request for information. On February 26, 2021, Blue Star furnished the requested documentation.

27.     By letter dated March 30, 2021, Federal denied Blue Star's Claim ("Denial"). Federal's denial of coverage is wrongful and constitutes a breach of the Policy as well as a breach of other legal obligations it owes to Blue Star as its insured. Federal's positions in the Denial were taken in bad faith, are expressly controverted by the evidence the Insured made available to Federal and are therefore patently unreasonable. Based upon this evidence and all facts made available to Federal, Federal knew or should have known its Denial was without reasonable basis.

28.     Following the Denial, the parties engaged in further correspondence as Blue Star continued to seek resolution of the Claim without court intervention. Specifically, on April 20, 2021, Blue Star responded to the Denial, detailing the basis for coverage. In response, Federal made its sixth request for information. Blue Star furnished the requested materials on May 4, 2021.

29.     On Wednesday, May 25, 2021, the parties participated in a video conference in which Federal advanced a brand-new theory to avoid accepting coverage, which was completely divorced from the facts of the customer relationship and the "guaranteed profit" it was supposed to generate. Moreover, Federal knowingly and unreasonably applied its brand-new theory to Employee 1's Theft even though Federal's theory was plainly inapplicable to the facts of Employee 1's Theft.

30.     On July 1, 2021, Blue Star sent a letter to Federal explaining the unreasonableness of its new theory. At that time, Blue Star also made a supplemental claim ("Supplemental Claim") under the Policy concerning the $3 million in stolen payments from Customer X during May and June of 2019, addressed *supra*, which Blue Star had uncovered during its continued investigation. Federal failed and refused to cover the Supplemental Claim after conducting no investigation and without providing the basis for its denial.

31.     On November 17, 2021, Blue Star again sent Federal correspondence explaining Federal's unlawful treatment of Blue Star's claim and providing notice of the instant action. On

December 17, 2021, Federal responded and renewed arguments it previously made in bad faith and failed to address the Supplemental Claim. Blue Star responded on January 19, 2022, further explaining why Federal's arguments lacked merit and advising Federal that Blue Star would be forced to file the instant lawsuit to resolve the matter.

32.     **Federal's Bad Faith Denial of Blue Star's Claim for Employee 1's Theft of $1,065,964.** Despite Blue Star's fulsome responses to each of Federal's inquiries, after making no specific investigation into Employee 1's Theft, Federal purported to deny Blue Star's Claim for Employee 1's Theft based *solely* upon the total funds in the opening balance of the relevant bank account on a date several *months* before the illegal transfers were made. In other words, Federal took the position that Employee 1's transfers did not constitute Theft based on the theory that an account balance that existed months earlier but was subsequently depleted should be carried forward *in perpetuity* without regard to any intervening transfers that pre-dated Employee 1's illegal transfers. Such a theory (*i.e.*, that other money existed at *some* point) could excuse virtually every theft imaginable.

33.     Specifically, Federal's sole basis for the Denial of Blue Star's Claim for Employee 1's theft was premised upon the opening balance of the relevant bank account in ***July*** of 2017. Federal *intentionally* ignored the fact that five of the six withdrawals at issue – totaling $969,964 – occurred months later in either September, October, November, or December of 2017. Federal further *intentionally* ignored the fact that the account balances in the relevant account went down to less than $10,000 in the period between the opening balance date on July 1, 2017 and the balances in the relevant account at the time of the illegal withdrawals by Employee 2.

34.     The following chart – which Federal had the opportunity to consider, but ignored – shows the opening balances in the relevant account on the first day of the month in which

unauthorized withdrawals occurred, as well as the balance available on the dates immediately prior

to such withdrawals, absent use of funds received from Customer X for Blue Star's benefit:

| Date of Payment to Employee 1's Company | Amount of Improper Transfer to Employee 1 Account | Account Balance on First Day of Month of the Withdrawal | Account Balance Prior to Withdrawal, Absent Use of Customer X's Funds |
|---|---|---|---|
| 9/1/17 | $74,982 | $6,018.89 | $6,018.89 |
| 9/11/17 | $194,982 | $6,018.89 | $9,195.33 |
| 10/5/17 | $150,000 | $7,660.29 | $8,305.11 |
| 11/10/17 | $250,000 | $6,198.70 | $7,842.89 |
| 12/12/17 | $300,000 | $8,974.63 | $41,078.17 |

As set out in detail in Blue Star's Claim, the source of funds for each of the forgoing

withdrawals originated solely from proceeds received from Customer X:

| Date of Payment to Employee 1's Company | Amount of Improper Transfer to Employee 1 Account | Source of Funds to Employee 1's Company |
|---|---|---|
| 9/1/17 | $74,982 | $974,982.00 wire on September 1, 2017, from Customer X, which was transferred to the relevant account in its entirety on that same day, of which $74,982.00 was then transferred to Employee 1's Company on that same day |
| 9/11/17 | $194,982 | $1,394,982.00 wire on September 11, 2017, from Customer X, which was transferred to the relevant account in its entirety on that same day, of which $194,982.00 was then transferred to Employee 1's Company on that same day |
| 10/5/17 | $150,000 | $399,982.00 wire on October 4, 2017, or from a $1,399,982.00 wire on October 5, 2017, both of which were from Customer X and then transferred in their entirety to the relevant account on the same respective days, of which $150,000.00 was then transferred to Employee 1's Company on October 5, 2017. |
| 11/10/17 | $250,000 | $1,449,982.00 wire on November 9, 2017, from Customer X and transferred in its entirety to the relevant account on that same day, of which $250,000.00 was then transferred to Employee 1's Company on that same day |
| 12/12/17 | $300,000 | $1,449,982.00 wire on December 11, 2017, from Customer X which was then transferred in its entirety to the relevant account on that same day, |

| Date of Payment to Employee 1's Company | Amount of Improper Transfer to Employee 1 Account | Source of Funds to Employee 1's Company |
|---|---|---|
| | | of which $300,000.00 was then transferred to Employee 1's Company on that same day |

35.     As a result, Blue Star demonstrated to Federal that (i) the balances in the relevant account were not sufficient to fund at least $969,964 of the $1,065,964 in illegal payments to Employee 1's company; and (ii) the source of funds for those withdrawals were proceeds received from Customer X for Blue Star's benefit. Thus, Federal's liability on this portion of the Claim is reasonably clear. Yet, instead of paying the Claim as it was legally obligated to do, Federal ignored this evidence and has continued to rely on the debunked opening balance justification to this day. However, as Federal wrongfully failed to accept, there was no basis for Employee 1 to transfer these customer payments to an entity owned by Employee 1. The Customer X payments were never transferred to Blue Star at any other point. Therefore, Employee 1 stole the money from Plaintiff, and Federal must pay the Claim.

36.     **Federal's Bad Faith Denial of the Supplemental Claim**. As referenced above, the apparent basis for Federal's denial of Blue Star's $3,000,000 Supplemental Claim has been chiefly to ignore it. Blue Star has provided Federal with evidence that clearly establishes Federal's liability. Specifically, Blue Star provided Federal with evidence of the Employees informing Blue Star's CFO that Customer X made payments totaling $3,000,000, including highly specific information:

Sorry been a hectic couple days. Total of 3 ▮▮▮▮ collections during May/June on 5/6, 6/4 & 6/17 in the amounts of $1.5M, $1M & $500K, respectively. Descriptions read "▮▮▮▮▮▮▮▮:OBI ▮▮▮▮ PAYMENT ONLINE"

Despite the precise description of the transfers, the $3,000,000 remains missing and unaccounted for to this day. Moreover, as Federal ignores, Employee 2 has failed to provide Blue Star with the bank records for this time period in a further effort to cover up the theft. Federal has not proffered any basis to show that these funds were ***not*** stolen, and its liability is beyond reasonably clear.

37.    **Federal's Bad Faith Denial of Employee 2's Thefts**. Federal also wrongfully denied Blue Star's claim for Employee 2's Theft. Throughout the parties' correspondence, Federal intentionally refused to even acknowledge, address, or explain the myriad facts that undermined its Denial. First, Federal ignored evidence showing that there was no way to fund the transfers of cash from Employee 2 to his own bank accounts absent use of the proceeds from Customer X's payments to Blue Star. As set forth below, it was impossible for Employee 2 to fund the transfers to his bank account without using funds that originated from payments by Customer X to Blue Star. Glaringly, often Employee 2 transferred nearly the identical amount of a Customer X payment that should have been for Blue Star to himself:

| Date of Transfer to Employee 2's Account | Amount of Payment(s) from Customer X Immediately Proceeding Transfer | Amount of Transfer to Employee 2's Account | Account Balance After the Transfer |
|---|---|---|---|
| 8/1/2017 | $1,394,982.00 | $1,270,000 | $15,555.56 |
| 8/24/2017 | $1,149,892.00 | $1,324,000 | $5,355.02 |
| 10/5/2017 | $1,799,964 | $400,000 | $8,305.11 |
| 1/9/2018 | $749,982.00 | $750,000 | $864.71 |
| 4/13/2018 | $999,982.00 | $500,000 | $1,575.42 |
| 7/5/2018 | $702,026.00 | $662,044 | $5,337.25 |
| 8/3/2018 | $349,982.00 | $350,000 | $436.11 |

38.    Moreover, Federal engaged in a series of additional bad faith tactics to avoid accepting its reasonably clear liability with respect to the Claim. First, Federal took a position that not even Employee 2 has taken with respect to the reason for the illegal transfers. Second, Federal intentionally failed to address that its newfound theory was in fact contrary to the position taken by Employee 2. Third, Federal deliberately ignored and failed to address or explain why Employee 2 attempted to conceal the illegal transfers from Plaintiff by providing Blue Star with heavily

redacted bank records. Fourth, Federal deliberately ignored and failed to address or explain why Employee 2 only agreed to provide unredacted bank information to Blue Star on the condition that those records not be shared with Blue Star's chief financial officer and its in-house counsel – the two individuals who would be most adept at uncovering a fraudulent financial scheme. Fifth, Federal deliberately ignored and failed to address or explain why Employee 2 physically altered and forged bank records to artificially inflate the account balances to evade detection by the Blue Star's auditors. Sixth, Federal deliberately ignored and failed to address or explain Employee 2's growing history of being sued for fraudulent conduct and Theft. Federal's Denial of Employee 2's theft was made in bad faith.

39.     As a result, Federal has engaged in bad faith to delay and avoid paying the Claim and Supplemental Claim. Because Federal knowingly committed the foregoing acts or practices constituting statutory bad faith, Blue Star may recover treble damages in addition to actual damages, court costs, and attorneys' fees under Chapter 541 of the Texas Insurance Code.

40.     **Discovery reveals additional thefts**.  During the course of discovery in this matter, the Insured has discovered additional thefts perpetrated by Employees 1 and 2 (the "Second Supplemental Claim").  *First*, at all relevant times, Customer Y was one of the Blue Star's customers.  After review of the discovery materials, Customer Y sent regular monthly payments for Blue Star's benefit during Employees 1 and 2's tenure as the Blue Star's employees.  There is no evidence that any of those payments were ever transferred to Blue Star in accordance with Employee 1 and 2's legal obligations.  In addition, Employees 1 and 2 continued to receive payments from Customer Y after Blue Star terminated their employment on April 10, 2020. Specifically, over the course of 16 months after Employees 1 and 2 were terminated, Customer Y paid $29,014 for Blue Star's benefit.  During that same time period, Employees 1 and 2 also received a total of $53,186 from other customer and payment sources that were for the benefit of

Blue Star.  Employees 1 and 2, despite having no entitlement to the $74,461, never notified Blue Star regarding receipt of these funds nor returned any of these funds, constituting Theft.

41.     *Second*, at all relevant times, Customer Z was one of Blue Star's customers.  On November 12, 2019, Customer Z made a payment of $103,349.40 for the benefit of Blue Star. Prior to that payment, the account balance was only $13,922.44.  Instead of transferring that money to Blue Star, a few days later, Employee 2 made three transfers in a total of $51,955.54 to an unknown bank account associated with one of his companies and a transfer of $67,678.00 to a bank account associated with another of his companies.  During the intervening time, there were no substantial inflows of cash, and there would have been no way for Employee 2 to fund these transfers absent embezzling the Customer Z payment.  Thus, Employee 2 stole the $103,349.40 Customer Z payment.

42.     *Third*, Blue Star has determined that Employee 2 owned and controlled an entity that never provided any services to the Insured and had no entitlement to any customer payments made for Blue Star's benefit.  However, Blue Star has determined that Employee 2 transferred a net total of $283,732 in cash to that entity, thus constituting Theft.

43.     *Fourth*, during his employment with Blue Star, Employee 1 improperly withdrew or transferred to himself at least $514,301, the majority of which were purportedly for expense reimbursements.  However, an examination of the expense reimbursement requests Employee 1 submitted to Blue Star reveals that Employee 1's expense reimbursement withdrawals were a sham. Specifically, every month Employee 1 submitted certain potentially legitimate expense reimbursement requests to Blue Star with back-up information (which are under review).  Those amounts were later paid by a Blue Star controlled account.  However, surreptitiously, at the same time, every month Employee 1 was also entering large, round bogus "expense reimbursement" amounts into Blue Star's journal entry system and simply helping himself to those amounts from

accounts he controlled access to, and in certain instances using PayPal to contrive to transfer cash from a Blue Star account under the guise of a legitimate reimbursement.  Apparently, Employee 1 was recording the journal entries to evade detection of his theft by Blue Star's accounting department.  However, there is no known support for any of those recorded amounts, and the amounts themselves, which mostly consist of round sums, are not consistent with a typical dollars-and-cents expense reimbursement.  Based on the documentation available to Blue Star and the amounts Employee 1 paid himself under the guise of expense reimbursement, Employee 1 improperly stole at least $263,143 of Blue Star's funds.

44.     *Fifth*, as part of Blue Star's investigation, it has uncovered that Employee 1 and 2 were deliberately directing Blue Star's customer payments either directly or via a "lockbox" into an account controlled by Employee 1 and 2. Then, each month, Employee 1 and 2 would "sweep" these lockbox payments from the account into another account instead of sending the customer payments directly to Blue Star.  These lockbox deposits, which consisted of customer payments made for Blue Star's benefit, totaled $883,472.66.  These payments were never transferred to Blue Star and constitute Theft.

45.     On August 4, 2022, Blue Star made demand upon Federal for the Second Supplemental Claim.  To date, Federal has not paid or covered the Second Supplemental Claim.

## V.     CONDITIONS PRECEDENT

46.     All conditions precedent to Plaintiff's claims for relief have been performed or have occurred.

## VI.     COUNTS

## COUNT I – BREACH OF CONTRACT

47.     Plaintiff restates and incorporates by reference each and every allegation set forth above as if fully set forth herein.

48.     The Policy constitutes a valid contract between Plaintiff and Federal.

49.     Plaintiff has fully performed its obligations under the Policy.

50.     By failing and refusing to pay Plaintiff's valid Claim, Supplemental Claim, and Second Supplemental Claim Federal has breached the Policy.

51.     As a direct result of Federal's breach of the Policy, Plaintiff has suffered damages in excess of $75,000 in an amount to be proven at trial.

**COUNT II – BREACH OF THE IMPLIED
COVENANT OF GOOD FAITH AND FAIR DEALING**

52.     Plaintiff restates and incorporates by reference paragraphs 1-50 as if fully set forth herein.

53.     Federal owes its policyholders, including Plaintiffs, a duty of good faith and fair dealing.

54.     Federal failed to reasonably investigate the Claim and Supplemental Claim to determine whether there was any reasonable basis for a denial of coverage or delay in payment.

55.     Federal denied Plaintiff's Claim and Supplemental Claim and failed to pay proceeds due under the Policy with no reasonable basis.

56.     Federal denied Plaintiff's Claim and Supplemental Claim with actual knowledge that its refusal to pay the Claim and Supplemental Claim would injure Plaintiff's business, forcing Plaintiff to incur substantial losses and costs, including but not limited to having to retain counsel and incur court costs to pursue its insurance claims through litigation.

57.     By its conduct alleged herein, Federal breached the implied covenant of good faith and fair dealing arising out of the Policy.

58.     Federal's breaches were intentional or grossly negligent, entitling Plaintiff to recover exemplary damages.

59.     To the extent Federal commits the foregoing breaches with respect to the Second Supplemental Claim, Plaintiff reserves the right to include such claim in this count.

### COUNT III – VIOLATION OF TEXAS INSURANCE CODE CHAPTER 541: UNFAIR METHODS OF COMPETITION AND UNFAIR OR DECEPTIVE ACTOS OR PRACTICES

60.     Plaintiff restates and incorporates by reference paragraphs 1-58 as if fully set forth herein.

61.     Federal's conduct constitutes multiple violations of Chapter 541 of the Texas Insurance Code. Plaintiff has provided written notice to Federal that Plaintiff seeks damages, costs, and attorneys' fees under the provisions of Chapter 541.

62.     Federal is engaged in the business of insurance within the meaning of the Texas Insurance Code.

63.     Federal made false statements of material facts and misrepresentations to Plaintiff relating to the Policy terms at issue, namely the terms relating to coverage for Thefts of an Employee.

64.     Federal failed to attempt in good faith to effectuate a fair, prompt, and equitable settlement of the Claim and Supplemental Claim, even though Federal's liability under the Policy is reasonably clear.

65.     Federal failed to promptly provide Plaintiff a reasonable explanation of the basis in the Policy, in relation to the facts or applicable law, for its Denial of the Claim and Supplemental Claim.

66.     Federal failed to conduct a reasonable investigation with respect to the claim prior to denying the claim.

67.     Federal's acts described herein constitute unfair methods of competition and unfair and deceptive acts or practices in the business of insurance under §§ 541.060(a)(1), 541.060(a)(2)(A), 541.060(a)(3), 541.060(a)(7), and 541.061 of the Texas Insurance Code.

68.     Federal knowingly committed the acts of unfair competition and unfair and deceptive acts or practices in the business of the Texas Insurance Code.

69.     As a result of Federal's foregoing violations of the Texas Insurance Code, Plaintiff has suffered substantial damages.

70.     Because each of the foregoing violations was committed knowingly by Federal within the meaning of § 541.002(1) of the Texas Insurance Code and was a producing cause of Plaintiff's actual damages, Plaintiff may recover up to three times the amount of its actual damages under section § 541.152 of the Texas Insurance Code.

71.     To the extent Federal commits the foregoing violations with respect to the Second Supplemental Claim, Plaintiff reserves the right to include such claim in this count.

### COUNT IV – VIOLATIONS OF TEXAS INSURANCE CODE CHAPTER 542: PROMPT PAYMENT CLAIMS

72.     Plaintiff restates and incorporates by reference paragraphs 1-70 as if fully set forth herein.

73.     Plaintiff provided timely written notice of its Claim on or around June 12, 2020 and its Supplemental Claim to Federal on or about July 1, 2021. Federal denied Plaintiff's Claim on or around March 30, 2021 and denied its Supplemental Claim on or about July 23, 2021.

74.     Federal has failed to timely pay Plaintiff's Claim and Supplemental Claim following receipt of all items, statements, and forms reasonably requested as required under §§542.055 of the Texas Insurance Code.

75.     Federal's conduct violates the Texas Prompt Payment of Claims Act, as codified in §§ 542.051 to 542.061 of the Texas Insurance Code.

76.     As a result of the foregoing violations, Plaintiff has suffered damages.

77.     Federal's failure and delay in payment entitles Plaintiff to payment of damages in the amount of Plaintiff's Claim and Supplemental Claim plus interest at 18% per year as damages, together with Plaintiff's reasonable and necessary attorneys' fees, and prejudgment interest. *Id*. §§ 542.058(a), 542.060(a).

78.     To the extent Federal commits the foregoing violations with respect to the Second Supplemental Claim, Plaintiff reserves the right to include such claim in this count.

## VII.   JURY DEMAND

79.     Plaintiff demands a trial by jury and has tendered the appropriate fee.

## VIII.   REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests entry of judgment on the Complaint as follows:

A.     On the breach of contract claim set forth above as Count I:

    1.     Compensatory and general damages in an amount to be proven at trial;

    2.     An award of costs, expenses and attorneys' fees pursuant to Chapter 38 of the Texas Civil Practice and Remedies Code and as otherwise permitted by law; attorneys' fees and costs incurred in obtaining the benefits due under the Policy;

    3.     Pre-judgment and post-judgment interest at the maximum legal rate; and

    4.     Such other and further relief as this court finds proper, just, and equitable.

B.      On breach of the implied duty of good faith and fair dealing set forth above as Count II, an award of compensatory damages, including all forms of loss resulting from the insurer's breach of duty and any other relief the court determines is proper, just, and equitable, including without limitation exemplary damages;

C.      On violations of Chapter 541 of the Texas Insurance Code set forth as Count III, an award of actual damages, which include the loss of the benefits that should have been paid pursuant to the Policy, court costs, and attorneys' fees and any other relief the court determines is proper; and an award of exemplary damages up to three times Plaintiff's actual damages under Texas Insurance Code § 541.152.

D.      On violations of Chapter 542 of the Texas Insurance Code set forth as Count IV, an award of actual damages plus 18% interest, together with Plaintiff's reasonable and necessary attorneys' fees and costs, and prejudgment interest under Texas Insurance Code §§ 542.051 to 542.061.E.

E.      Such other and further relief as this Court finds proper, just, and equitable

Dated: August 11, 2022

Respectfully submitted,

By: */s/Amy Elizabeth Stewart*
    Amy Elizabeth Stewart
    State Bar No. 00784300
    amy@amystewartlaw.com
    Gabrielle Kickham
    State Bar No. 00784300
    gabrielle@amystewartlaw.com
    **AMY STEWART PC**
    5307 E. Mockingbird Lane, Suite 425
    Dallas, Texas 75206
    (214) 233-7076 - telephone
    (214) 975-2806 - telecopier

    And

    David M. Stein
    State Bar. No. 00797494
    dstein@brownrudnick.com
    **Brown Rudnick LLP**
    2211 Michelson Drive, 7th Floor
    Irvine, CA 92612
    (949) 752-7100 – telephone
    (949) 252-1514 – telecopier

    And

    Dylan P. Kletter (*pro hac vice*)
    dkletter@brownrudnick.com
    Kelsey D. Bond (*pro hac vice*)
    kbond@brownrudnick.com
    **BROWN RUDNICK LLP**
    185 Asylum Street
    Hartford, CT 06103-3402
    (860) 509-6500 - telephone
    (860) 509-6501 - telecopier

    **ATTORNEYS FOR PLAINTIFF**
    **BLUE STAR SPORTS HOLDINGS, INC.**

## <u>CERTIFICATE OF SERVICE</u>

I certify that on August 11, 2022, a true and correct copy of the foregoing was served by electronic transmission via the Court's CM/ECF system upon all parties registered to receive electronic notice in this case.

*/s/Dylan P. Kletter*
Dylan P. Kletter *(pro hac vice)*

4857-9242-1934, v. 1
